**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MICHAEL ANDREWS, etc., et al.,

        Plaintiffs,

vs.                                    Case No. 3:06-cv-704-J-32HTS

CSX TRANSPORTATION, INC., et al.,

        Defendants.

_____

## ORDER[1]

Plaintiffs in this consolidated action bring claims under the Family Medical Leave Act ("FMLA"). 29 U.S.C. § 2601, *et seq.* (Doc. 81.)[2] Defendants and plaintiffs both move for summary judgment, (Docs. 106, 107, 108, 109, 110, 111, 112), and each party filed responses. (Docs. 119, 120, 121, 122, 123, 124, 125.)

## I.   Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it is intended to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

[2] This case was previously divided into Complaint "A" and Complaint "B." The Court here addresses only those claims brought in Complaint "B." (Docs. 49, 81.) The plaintiffs in Complaint "B" are Charisse Bell ("Bell"), Staphenia Simmons ("Simmons"), Leonard Platt ("Platt") and Harvey Bolton ("Bolton"). The named defendants are CSX Transportation, Inc. ("CSXT"), CSX Intermodal, Inc. ("CSXI"), and CSX Corporation ("CSXC").

burden of demonstrating the satisfaction of this standard lies with the movant, who must present 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine, material factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." T-Mobile South LLC v. City of Jacksonville, Fla., 564 F.Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## II. General FMLA Legal Standards

"Among the substantive rights granted by the FMLA to eligible employees are the right to 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee, 29 U.S.C. § 2612(a)(1), and the right following leave to be restored by the employer to the position of employment held by the employee when the leave commenced or to an equivalent position." Drago v. Jenne, 453 F.3d 1301, 1305-06 (11th Cir. 2006) (citation and internal quotations omitted). FMLA leave "may be taken intermittently or on

2

a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1); see also 29 C.F.R. § 825.203 (2006).[3][4] "If an employee takes leave on an intermittent or reduced leave schedule, only the amount of leave actually taken may be counted toward the 12 weeks of leave to which an employee is entitled." 29 C.F.R. § 205(a) (2006).

An employer can require an employee to substantiate his request for leave under the FMLA with a medical certification of his condition. 29 U.S.C. § 2613. The Act provides that an FMLA certification from a health care provider "shall be sufficient" if it states the date on which the condition commenced, the probable duration of the condition, and appropriate medical facts regarding the condition. 29 U.S.C. § 2613(b). Medical certification for intermittent leave or leave on a reduced leave schedule shall include a statement of the medical necessity "and the expected duration of the intermittent leave or reduced schedule." Id. at § 2613(b)(6).

To enforce the rights guaranteed to employees under the statute, the FMLA creates two types of claims: (1) interference, which occurs when the employer burdens or denies a substantive statutory right to which the employee is entitled, and (2) retaliation, where the employer discharges or otherwise discriminates against an employee for invoking rights

---

[3]    The Department of Labor's FMLA regulations were revised, effective January 16, 2009. See 73 Fed.Reg. 67934 et seq. (Nov. 17, 2008). The revised regulations were not in effect at any time relevant to plaintiffs' claims and when their lawsuit was filed in 2006. Reference to regulations are to those published in the July 1, 2006 Code of Federal Regulations. The parties do not dispute the reference to the 2006 regulations.

[4]    The regulations recognize that some serious health conditions may be chronic, causing the employee "episodic incapacity" rather than continuous incapacity. 29 C.F.R. § 825.114 (a)(2)(iii)(C)(2006).

under the Act.  29 U.S.C. § 2615(a) and (b); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir. 2000).[5]  To succeed under either type of claim, "[p]laintiff[s] must first demonstrate that [they] had a 'serious health condition.'"  Hegre v. Alberto-Culver USA, Inc., 485 F. Supp.2d 1367, 1377 (S.D. Ga. 2007), aff'd 275 F. App'x 872 (11th Cir. 2008); see also Russell v. N. Broward Hosp., 346 F.3d 1335, 1340 (11th Cir. 2003).  A "serious health condition" is one that involves either inpatient treatment or continuing treatment by a health care provider.  29 U.S.C. § 2611(11).  A chronic illness, causing only episodic incapacity, may constitute a "serious health condition."  29 C.F.R. § 825.114(a)(2)(iii)(C)(2006).

"To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."  Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001); see also Drago, 453 F.3d at 1306; 29 C.F.R. § 825.220 (2006).  The plaintiff need not prove his employer's intent or motive; "the employer's motives are irrelevant" to an interference claim.  Strickland, 239 F.3d at 1208.  "'Interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 220(b) (2006).

Any employer who violates the FMLA shall be liable to the eligible employee affected for damages, including "wages, salary, employment benefits, or other compensation denied

---

[5]    While the FMLA does not specifically label them as "interference" or "retaliation" claims, Eleventh Circuit precedent has adopted these designations.  O'Connor, 200 F.3d at 1352.

or lost to such employee by reason of the violation" or "any actual monetary losses sustained by the employee as a direct result of the violation" up to a sum equal to 12 weeks of wages or salary, plus possible liquidated damages up to the amount of compensatory damages. 29 U.S.C. § 2617(a)(1)(A)(i)-(iii). Additionally, the eligible employee may be entitled to equitable relief if "appropriate," including employment, reinstatement, and promotion. 29 U.S.C. § 2617(a)(1)(B).[6] The FMLA provides no relief unless the employee has been prejudiced by the violation; "the remedy is tailored to the harm suffered." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002); see also Demers v. Adams Homes of Northwest Fla., Inc., 321 F. App'x 847, 849 (11th Cir. 2009). "[E]ven where there may have been technical violations of the FMLA, those violations are not compensable where . . . a plaintiff has failed to demonstrate that he suffered any 'adverse employment action.'" Drago, 453 F.3d at 1307; see also Demers, 321 F. App'x at 849 (a plaintiff "may not recover for 'technical infractions under the FMLA . . . in the absence of damages'" (citation omitted)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999)("a plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most

---

[6]    "[T]he FMLA provides for neither emotional distress damages nor nominal damages, and equitable relief is not appropriate in the absence of an FMLA injury." Billups v. Tampa Sports Auth., No. 8:06-cv-1433-T-23TGW, 2007 WL 4093232, at *9 (M.D. Fla. Nov. 15, 2007)(citations omitted). Federal courts have repeatedly ruled that damages for emotional distress, as well as nominal, consequential, and punitive damages are not available under the FMLA. See Farrell v. Tri-County Metropolitan Transp. Dist. of Oregon, 530 F.3d 1023, 1025 (9th Cir. 2008); Brumbalough v. Camelot Care Ctrs., Inc., 427 F.3d 996, 1007 (6th Cir. 2005)(collecting cases); Rodgers v. City of Des Moines, 435 F.3d 904, 909 (8th Cir. 2006)(same); Graham v. State Farm. Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999)("FMLA does not does not allow recovery for mental distress or the loss of job security").

of it"); cf Ragsdale, 535 U.S. at 82 ("§ 2617 provides no relief unless the employee has been prejudiced by the [employer's] violation").

## III.    Lack of Subject Matter Jurisdiction as to Defendants CSXI and CSXC

Defendants CSXI and CSXC contend they are entitled to judgment as to Plaintiffs Bell, Simmons, Platt and Bolton because they are not and never have been plaintiffs' "employer" within the meaning of 29 U.S.C. § 2611(4).  As support, they proffer the affidavit of former CSXT director of labor relations Andrea Mateer, who states "CSXT, CSXI, and CSXC are separate corporate entities within the CSX family of companies."  (Doc. 84-2 at 5 (Mateer Decl. ¶ 13).)  At times material, "final decisions regarding FMLA eligibility and other FMLA matters with respect to a particular employee are made by the CSX entity that employs the employee."  (Id.; see also Doc. 83-2 at 17 (Dove Decl. ¶ 48).)

Though their complaint fails to differentiate among CSXT, CSXI and CSXC, plaintiffs all admit that they were employees of CSXT and have never worked for CSXI or CSXC. There is no evidence that plaintiffs were jointly employed by CSXT and CSXC or CSXI, that they performed work that simultaneously benefitted two or more of these companies, or that they worked for two or more of them at different times during the work-week.  See 29 U.S.C. §§ 2611(4), 2617(a); 29 C.F.R. §§ 825.104, 825.106 (2006).

"[W]here a defendant in an FMLA suit does not meet the statutory definition of 'employer,' there is no federal subject matter jurisdiction over the claim against that defendant."  Wascura v. Carver, 169 F.3d 683, 685 (11th Cir. 1999).  Plaintiffs' claims against CSXI and CSXC are due to be dismissed for lack of subject matter jurisdiction.  See Cochran v. U.S. Health Care Financing Admin., 291 F.3d 775, 778 n.3 (11th Cir. 2002)("lack

6

of subject matter jurisdiction may be raised at any time").

## IV. **Plaintiffs' Claims**[7]

### A. **Charisse R. Bell: Count I ("8 Hours Medical Restrictions")**[8]

Plaintiff Charisse R. Bell alleges that CSXT violated her rights under the FMLA in late 2004 and 2005 when they 1) improperly deducted assigned overtime hours that she declined to work because of her serious health condition from her 12 weeks of available FMLA leave, in violation of 29 C.F.R. § 825.205 (2006), and 2) required her to obtain a re-certification of her serious health condition from her health care provider as a result of her refusal to work such overtime hours.  (Doc. 81 at 6-8 (Compl. ¶¶ 23-45).)

Bell has been employed by CSXT as a crew dispatcher in CSXT Crew Management Control ("CMC") since 1998.  Her normal work assignment with CSXT was five days a week, eight hours a day.  Bell was first approved for intermittent FMLA leave in March 2001 because of a chronic condition ("diabetes mellitus") that her physician indicated she had been suffering from since 1998.  (Doc. S-1 (Bell Dep. Ex. 4); see also Doc. 108-3.) Thereafter, Bell submitted annual certification forms from her physician in 2002, 2003, and

---

[7]  Consistent with summary judgment practice, the facts stated are either undisputed or are stated in a light most favorable to plaintiff.  See Galvez v. Bruce, 552 F.3d 1238, 1239 (11th Cir. 2008); White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1430 (11th Cir. 1997).

In these cases, the parties do not dispute that the individual plaintiffs are eligible employees, 29 U.S.C. § 2611(2) and that CSXT is an eligible private sector employer.  29 U.S.C. § 2611(4).

[8]  The parties have filed cross motions for summary judgment as to Charisse Bell. (Docs. 108, 109.)

2004 for the same chronic and additional medical conditions (including anemia and reflux). (Doc. S-1 (Bell Dep. Exs. 5, 7, 12).) In 2002, 2003 and 2004, the health care provider indicated that Bell's chronic condition made it necessary for her to work intermittently, that Bell needed to be seen by her doctor quarterly, and that the probable duration of her condition was "unknown." (Id.)

During 2001-2004, Bell was permitted to use intermittent FMLA leave to excuse her from working assigned overtime, and she received no discipline as a result. (Doc. 117-2 at 15, 31 (Bell Dep. at 67, 116).) Bell's FMLA leave bank was not reduced when she declined working assigned overtime hours. (Bell Dep. at 87, 116.)

On July 18, 2004, Bell was advised that her most recent request for FMLA leave, received by "CSX Medical Dept." on July 14, 2004 (Doc, S-1 (Bell Ex. 12)), had been approved and that her approved use of FMLA was for intermittent leave and quarterly follow-up doctor office visits. (See Doc. 117-2 at 136 (Bell Dep. Ex. 19).) CSXT determined that Bell's annual FMLA entitlement for intermittent leave during any given 12-month period was 480 hours (12 weeks @ 40 hours a week = 480 hours). (Bell Dep. at 155, 238.)

In November 2004, CMC managers began charging against the employees' 12-week FMLA leave entitlement by the number of overtime hours the CMC employee declined to work on an hour-for-hour basis. "Thus, if a CMC employee approved to use intermittent FMLA leave to decline overtime work refused to work a mandatory eight-hour overtime shift because of his or her health, CMC charged the employee with the use of eight hours of FMLA leave." (Doc. 84-2 at 3-4 (Mateer Decl. ¶ 7).) According to CSXT's Mateer, this practice was approved in early 2005 by the U.S. Department of Labor. (Mateer Decl. ¶ 8.)

Throughout 2004 and 2005, Bell was permitted to use intermittent FMLA leave to avoid working her regular eight-hour shift on days she did not feel well enough to do so, totaling 18 days in 2004, and 16 days in 2005. (Doc. 117-2 at 69 (Bell Dep. Ex. 2).) Additionally, between November 2004 and April 2005, Bell was "marked off" for using intermittent FMLA leave for declining, for health reasons, to work assigned overtime on days she worked a regular eight-hour shift. The total "mark off" for declined overtime was 137 hours and 39 minutes. (Bell Dep. at 87-99; Bell Dep. Ex.2; Docs. 109 at 6; 124 at 3.)[9]

During the 12-month period between March 9, 2004 and March 28, 2005, which included the period that CSXT deducted unworked overtime hours from employees' FMLA banks, Bell used a total of 243.22 hours of FMLA leave, well below the 480 hours (12-week) FMLA entitlement. (Doc. 109 at 7; Bell Dep. at 70.) For calendar years 2004 and 2005, Bell used 272 hours of FMLA leave in order to be absent from her regular 8-hour shift, plus 137 hours and 39 minutes "marked off" for overtime missed, for a total of 409 hours for the 24-month period. At no time did Bell approach using the full FMLA 480 hour entitlement for a 12-month period. (See Bell Dep. at 70, 155, 237.)

On March 1, 2005, CSXT manager of FMLA administration Jolanda Johnson (later Jolanda Dove) requested Bell to obtain a FMLA recertification from her health care provider, saying:

---

[9] There is a 16-hour discrepancy between Bell's and CSXT's tally of overtime hours "marked off" from Bell's FMLA leave bank. (See Docs. 109 at 6; 124 at 3.) Bell's employee work-log appears to support Bell's representation that she was "marked off" eight hours for declining overtime on January 14 and 28, 2005. (See Doc. 117-2 at 86-87 (Bell Dep. Ex. 2).) Stating the facts in a light most favorable to Bell as nonmovant, the Court adopts Bell's accounting. (Doc. 124 at 3.)

> On July 18, 2004, you were advised that your request for FMLA
> leave for your own serious health condition was approved. Your
> approved use of FMLA was for intermittent leave and quarterly
> follow-up office visits.
>
> Since your approval for FMLA, your use of FMLA has included
> a 24-day period between July 24, 2004 and February 20, 2005.
>
> Your current FMLA certification form from your health care
> provider does not support this use of FMLA leave. Therefore,
> we are requiring you to obtain a recertification from your health
> care provider.

(Doc. 117-2 at 136 (Bell Dep. Ex. 19).) During this period, Bell was absent from her regular eight-hour shift on 11 days, and on 13 days she declined to work assigned overtime after having worked her regular eight-hour shift. (Bell Dep. at 87-99; Bell Dep. Ex.2.) "CSXT had not requested Ms. Bell to recertify her entitlement to FMLA leave based on her chronic health condition within the 30-day period prior to March 1, 2005." (Doc. 113-2 at 7 (Dove Supp. Decl. ¶ 11).)

On April 15, 2005, CSXT's Mateer met with a different Labor Department official who advised her that when an employee approved for this form of intermittent FMLA leave works a normal eight-hour work assignment and then declines to work assigned overtime, CSXT could not charge the unworked overtime hours against the employee's FMLA leave entitlement. (Doc. 84-2 at 4 (Mateer Decl. ¶ 9).) That same day, Mateer sent an e-mail to company officials stating, "This is a follow-up to my phone call in reference to charging FAM [a certain FMLA leave time entry code] against the FMLA entitlements when an employee uses FMLA as the reason for refusing forced overtime. Please discontinue this practice until further advised." (Doc. 84-3 at 2 (Mateer Decl. Ex. A); Mateer Decl. ¶¶ 9, 10.)

At no time since April 15, 2005, has CSXT charged an employee's FMLA leave entitlement when the employee has declined to work overtime hours on the basis of approved intermittent leave, and CSXT through its agents states that it has no intention of doing so in the future. (Mateer Decl. ¶ 11; Dove Decl. ¶¶ 15, 47.) Further Bell's FMLA leave entitlement has never been reduced after April 4, 2005 by her declining to work overtime hours. (Bell Dep. at 108.) After that date, Bell continued to decline to work assigned overtime hours based upon her medical condition, but CSXT has never required her to work overtime when she is medically unable to do so, nor has it reduced her FMLA leave entitlement or disciplined her for declining to work. (Bell Dep. at 204-05, 210, 214, 216, 225.)

On June 30, 2005, "Plaintiff Bell requested that a total of 103.22 FMLA hours allegedly taken 'for overtime' be restored to her FMLA 'bank.'" (Doc. 91 at 8 (Answer ¶ 41); see also Doc 81 at 7 (Compl. ¶ 41).) On July 1, 2005, Andrea Mateer refused Bell's request. (Compl. ¶ 42; Answer ¶¶ 42, 45 ("CSXT dened Plaintiff Bell's request to 'credit' her FMLA bank with hours that previously had been deducted when she used FMLA leave to avoid working overtime").)

Bell is currently approved to use intermittent FMLA leave both for episodes when her illness prevents her from working her normal shift and to decline working overtime at her discretion. (Bell Dep. at 214).)

### 1.    "Marking Off" FMLA Leave Time For Overtime Hours

Bell contends that CSXT interfered with her rights under the FMLA when it "repeatedly required Ms. Bell to use her allotted FMLA leave in order to avoid forced overtime shifts" between November 2004 and April 2005, and refused to "restore" the "wrongfully taken

hours to [her] FMLA leave bank." (Doc. 124 at 5.) CSXT argues that it is entitled to judgment on Bell'sCount I interference claim because she was not deprived of any FMLA-provided benefit and suffered no FMLA-cognizable injury as a result of the "docking" of her FMLA leave bank for a six-month period. (Doc. 109 at 13.) Bell "does not allege that, as a result of this allegedly improper conduct, she ever exhausted her available FMLA leave, was denied an FMLA leave to which she was entitled, or suffered any economic loss or injury." (Doc. 109 at 14.) Further, Bell acknowledges that on April 15, 2005, CSXT discontinued the practice of "marking off" FMLA leave entitlement for declining assigned overtime work beyond a regularly scheduled eight-hour shift. (Id.)

Bell responds that "an exhaustion of leave entitlement is not one of the elements required to make up a claim of FMLA interference." (Doc. 124 at 6.) Bell argues that "[t]he hours deducted from Ms. Bell's leave bank were part of her entitlement. Such wrongful deductions denies her leave to which she was entitled, under the statutory framework of the FMLA." (Doc. 124 at 8.)

Assuming without deciding that CSXT's practice of "marking off" FMLA leave time for unworked overtime constituted actionable "interference" under the FMLA, Bell fails to demonstrate that such interference caused her prejudice. Though Bell contends she was improperly docked FMLA leave time, CSXT never denied her leave when she requested it. See Rogers v. City of Des Moines, 435 F.3d 904, 909 (8th Cir. 2006)(plaintiff suffered no prejudice where undisputed evidence showed plaintiff received her requested FMLA leave). In fact, Bell always had FMLA leave hours to spare in the overtime "mark offs" years. Bell adduced no evidence that she would have taken additional FMLA leave time had her "bank"

not been "marked off" for the overtime hours declined, or had the "marked off" hours been "restored" to her FMLA leave bank as she requested.

The FMLA remedial scheme does not require that individuals be compensated merely because the employer has violated the statute. Rather, it provides relief only if the employee has been prejudiced by the violation. Bell may not recover for a "'technical infraction' . . . in the absence of damages." Demers, 321 F. App'x at 849; see also Drago, 453 F.3d at 1307; Graham, 193 F.3d at 1284 (summary judgment for employer; "[e]ven if the defendant [has] committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages").

Besides failing to show that she was subject to an adverse employment action, Bell has not demonstrated she suffered any "actual monetary loss" as a result of CSXT's actions, 12 U.S.C. § 2617(a)(1)(A)(i)(II), nor is equitable relief warranted.[10]

---

[10]    The Court is not saying that an employer may consistently violate the FMLA with impunity or that "technical" FMLA violations may never lead to redress. The holdings in this Order are limited to the undisputed facts presented here.

This case is distinguishable from the case cited by plaintiffs, Harcourt v. Cincinnati Bell Tel. Co., 383 F. Supp. 2d 944 (S.D. Ohio 2005), in which the court held that 1) the employer's policy forbidding employees from filling out any portion of the medical certification form at the risk of discipline; 2) the employer's blanket policy of requiring recertification of the need for intermittent leave every ninety days regardless of the health care provider's certification that the employee needed more than ninety days of intermittent leave, and 3) the employer's blanket policy that the employee must provide medical certification of unexpected FMLA leave within 15 days with no exceptions, all violated the FMLA. In that case, the plaintiffs presented evidence that they were disciplined, denied leave, and discouraged to seek FMLA leave as a result of the policies. 383 F. Supp.2d at 948-51, 956, 962. Additionally, the court determined that injunctive relief was appropriate. Id. at 962. Recognizing that "under the FMLA, plaintiffs are not entitled to symbolic victories for technical violations of the Act," the court stated that

## 2. **Bell's Recertification Claim**[11]

Under the FMLA, "[t]he employer may require that the eligible employee obtain subsequent recertifications on a reasonable basis." 29 U.S.C. § 2613(e) (2006); see also Brumbalough v. Camelot Care Ctrs., Inc. 427 F.3d 996, 1002 (6th Cir. 2005); Stoops v. One Call Communications, Inc., 141 F.3d 309, 312 (7th Cir. 1998). Regulations implementing the FMLA in 2006 provided that "[a]n employer may request recertification no more often than every 30 days and only in connection with an absence by the employee" unless certain

_____

> There is a substantial difference between an employer committing a technical violation of the FMLA and the employer's wholesale enforcement of policies which violate the FMLA. . . . [A] technical violation occurs when an employer makes a mistake in applying the FMLA in a particular circumstance. In this case, . . . the evidence demonstrates that [employer] rigidly and uniformly enforced unlawful leave policies. These policies transcend mere technical violations of the FMLA.

Id. at 962. Citing "substantial evidence that [employer's] policies actually discouraged Plaintiffs from utilizing their FMLA entitlements," and the "needlessly onerous policies," id. at 962-63, the Court held: . . .

> [E]ven assuming Plaintiffs have no economic damages, there is sufficient evidence to show that Plaintiffs have incurred injuries which would entitle them to injunctive relief.

Id. at 963. Unlike Harcourt, here there are no "blanket" or "wholesale" policies of CSXT which have been shown to violate the FMLA to the detriment of plaintiffs either now or in the future. CSXT acknowledges that it made a mistake in "marking off" FMLA leave for declined overtime, which it immediately corrected upon learning of the error. Plaintiff presents no evidence that CSXT's short-lived overtime policy in any way denied her FMLA leave to which she was entitled, resulted in discipline, or discouraged her use of leave. At no time since April 2005 has CSXT charged FMLA leave for overtime not worked, and CSXT states, through its agents, that it has no intention of doing so in the future.

[11] Bell classifies this as an "interference" claim. (See Doc. 108 at 1.)

exceptions apply. 29 C.F.R. § 825.308(a) (2006); see also Stoops, 141 F.3d at 312. If the medical certification indicates that the minimum duration of the condition is more than 30 days, the employer must wait to request recertification until the term specified by the health care provider expires unless certain exceptions apply. Id. § 825.308(b)(2).[12] "For FMLA leave taken intermittently or on a reduced leave schedule basis, the employer may not request recertification in less than the minimum period specified on the certification as necessary for such leave (including treatment) unless . . . (1) The employee requests an extension of leave; (2) Circumstances described by the previous certification have changed

———————————————

[12] The regulatory scheme of 29 C.F.R. 825.308 (2006) is more fully described as follows:

> Subsection (a) of 29 C.F.R. § 825.308 indicates that an employer may request recertification every thirty days for absences due to pregnancy or chronic and/or long-term conditions and may request recertification more often if circumstances have changed or the employer receives information that casts doubt upon the employee's stated reason for the absence. The employer's authority to obtain a recertification every thirty days is limited, however, by subsection (b) of § 825.308. Subsection (b) states that if the employee's health care provider has specified a minimum duration the employee needs FMLA leave, the employer may not request recertification in less than the minimum period specified on the certification unless the employee requests an extension of leave, circumstances have changed, or the employer receives information that casts doubt on the validity of the certification. Finally, subsection (c) of § 825.308 is a catchall provision which applies if subsections (a) and (b) are inapplicable. Subsection (c) allows the employer to obtain a recertification at any reasonable interval, but not more frequently than every thirty days, unless one of the above three exceptions applies.

Harcourt, 383 F. Supp. 2d at 956-57.

significantly (e.g., the duration of the illness, the nature of the illness, complications); or (3) The employer receives information that casts doubt upon the continuing validity of the certification." 29 C.F.R. § 825.308(b)(2) and (c)(1)(2) and (3) (2006).

CSXT argues that § 825.308(b)(2) is not applicable because "Bell's physician did not specify the probable duration of the period during which she would need intermittent leave." (Doc. 109 at 19 (citing Harcourt, 383 F. Supp. 2d at 957-58 (subsection (a) of regulation § 825.208 "still applies where the healthcare provider does not specify a minimum duration that leave is required")).) Additionally, CSXT contends the request for recertification was justified "because Ms. Bell had experienced 24 absences during a seven-month period." (Doc. 109 at 19.) Bell responds that CSXT "did not have a clear policy when requesting recertification based on the number of absences." (Doc. 124 at 9.)[13]

The undisputed evidence establishes that Bell was approved for FMLA intermittent leave and quarterly office visits on July 18, 2004 (Bell Dep. Ex. 19), eight months before CSXT's March 1, 2005 request for recertification. In requesting recertification, CSXT cites to Bell's use of FMLA on 24 occasions since that last approval. Significantly, Bell's attendance records highlight a significant up-tick in Bell's use of FMLA leave time to take off regularly scheduled eight-hour shifts in January and February 2005 (January 15, 16, 17, 20, 21, 22, 23, 28 and February 11, 13, 14, 18, 20). Given this record of increased absences, CSXT's request for recertification was reasonable. 29 U.S.C. § 2613(e).

---

[13]  Bell cites to "Mateer Dep. 117/20-118-8" as support for this statement. The Court is unable to locate these pages to the Mateer deposition in the extensive record in this case. (See Doc. 106-12.)  Nonetheless, the Court accords this argument weight inasmuch as the record contains no evidence of CSXT's policy regarding recertifications.

Moreover, the previous certifications for Bell's intermittent leave stated that the duration of her need for intermittent leave was "unknown." (Doc. S-1 (Bell Dep. Exs. 4, 5, 7, 12).) When a doctor's certification does not indicate how long the employee will continue to need intermittent leave, the employer is entitled to require the employee to obtain additional information. See Muhammad v. Indiana Bell Tel. Co., 182 F. App'x 551, 553-54 (7th Cir. 2006); see also Williams v. Boeing Co., 166 F.3d 1219 (9th Cir. 1999)(unpublished disposition)(employer "did not abuse the recertification requirement by asking [employee] to recertify twice during a one-year period"); Parsley v. City of Columbus, Ohio Dept. of Public Safety, 471 F. Supp.2d 858, 863-64 (S.D. Ohio 2006)(employer did not violate FMLA by requiring plaintiff to recertify her chronic health condition every thirty days when health condition certified for "lifetime").

CSXT's recertification request was not abusive and did not interfere with Bell's FMLA rights, cause her to lose benefits under the Act or to suffer monetary loss. Indeed, Bell submitted her physician's recertification which confirmed that Bell's pattern of absences was consistent with her serious health condition. (Doc. 117-2 at 138, 149 (Bell Dep. Exs. 21, 28).) She was then approved for continuing FMLA leave. (Doc. 177-2 at 149 (Bell Dep. Ex. 28).) There is no evidence that Bell was prejudiced in any way by CSXT's request for recertification or that CSXT's request was improper under FMLA regulations.

### 3. **Equitable Relief**

Bell contends that she is entitled to equitable injunctive relief, regardless of whether she has suffered economic loss, where her employer "'rigidly and uniformly enforced unlawful leave policies,'" because "'employers should not be able to maintain unlawful

17

policies just because their employees eventually receive the leave and the benefits to which they are entitled.'" (Doc. 124 at 13-14 (quoting <u>Harcourt</u>, 383 F. Supp.2d at 963).)[14] She "seeks a credit for the unauthorized and illegal reduction of benefits in the past" and apparently, an "assurance in writing" that CSXT "will not unlawfully deduct from her FMLA without this lawsuit." (<u>Id.</u>)

Whether to grant equitable relief is discretionary. <u>Demers</u>, 321 F. App'x at 849 (citing 29 U.S.C. § 2616). This Court has ruled that the equitable relief is not appropriate under the FMLA in the absence of an FMLA injury. <u>Billups v. Tampa Sports Authority</u>, No. 8:06-cv-1433-T-23TGW, 2007 WL 4093232, at *9 (M.D. Fla. Nov. 15, 2007)(citing <u>Rogers</u>, 435 F.3d at 909 ("[b]ecause [the plaintiff] suffered no prejudice, the FMLA provides no equitable relief"); <u>see also</u> <u>Ragsdale</u>, 535 U.S. at 89 ("§ 2617 provides no relief unless the employee has been prejudiced by the violation . . . . [T]he remedy is tailored to the harm suffered"). Because Bell suffered no prejudice, the FMLA provides no equitable relief. <u>See</u> <u>Rogers</u>, 435 F.3d at 909.

Second, even if equitable relief were available, Bell is not eligible for "credit" for the 137 hours and 39 minutes "marked off" between November 2004 and April 2005. She has made no showing that she was actually denied any FMLA leave time requested as a result of the "mark offs." Giving her "credit" three years after the fact for FMLA leave time she did not request and was not denied, and could not use now, is not an "appropriate" equitable remedy. 29 U.S.C. § 2617(a)(1)(B). Moreover, "to obtain prospective injunctive relief a

---

[14] The Court assumes Bell is referring to CSXT's now abandoned practice of deducting declined overtime assignments from her FMLA leave bank.

plaintiff must show that he faces a substantial likelihood of injury in the future." Wooden v. Bd. of Regents of University Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001). Given CSXT's voluntary change in its FMLA overtime policy (which predated this lawsuit) and no demonstrated prospect of an FMLA violation in the future, there is no basis for equitable relief.[15]

## B. Charisse R. Bell; Count III ("Office Visits Only")

In Count III, Bell contends that following the March 2005 submission of her health provider's medical recertification, CSXT improperly restricted her use of FMLA intermittent leave to office visits only, denying her leave for "episodes" (days on which she was unable to work because of her serious health condition), contrary to the recommendation of her health care provider. (Compl. ¶¶ 81, 83, 97.) CSXT counters that it is undisputed "that CSXT never restricted Ms. Bell's use of intermittent FMLA leave to 'office visits only.'" (Doc. 109 at 2.) This Count is based upon a series of misunderstandings.

On July 14, 2004, Bell submitted a certification by her physician which indicated that because of her chronic condition, it would be necessary for Bell to work intermittently (but did not specify any particular limitations or frequency of episodes of incapacity) and to see her physician quarterly. (Doc. S-1 (Bell Dep. Ex. 12).) On July 18, 2004, Bell was approved for intermittent FMLA leave for her serious health condition and for quarterly follow-up office visits. (See Bell Dep. Ex. 19.)

In response to CSXT's request in March 2005 that Bell's health care provider re-certify

---

[15] See supra n.10.

Bell's chronic health condition, Bell's physician completed the form on March 16, 2005, and indicated that Bell's 24 absences since July 2004 were consistent with Bell's medical condition. (Bell Dep. Ex. 21; Doc. S-1 (Bell Dep. Ex. 23).) On the certification form dated March 16, 2005, Bell's physician checked "yes" that it would be "necessary for the employee to work only intermittently or to work less than a full schedule as a result of the condition" and wrote: "Patient unable to work over 16 hrs. job due to her medical condition." (Doc. S-1 (Bell Dep. Ex. 23).) Bell did not read the comment by her physician and was unaware that the physician had stated that Bell could work up to 16 hours. (Bell Dep. at 147.)

On April 13, 2005, CSXT FMLA administrator Dove (then Jolanda Johnson) wrote to Bell: "you have been approved for FMLA leave for you own serious health condition to be taken intermittently in accordance with your medical certification. Specifically, you are approved leave as needed for office visits as well as leave sufficient to ensure that you do not work more than sixteen (16) hours per day necessitated by your medical condition." (Doc. 117-2 at 149 (Bell Dep. Ex. 28).) Bell did not pick up the certified letter from the post office until May 17 or 18, 2005, and was unaware of its contents. (Bell Dep. at 157.) In May 2005, Bell "marked off" "FMLA" on seven occasions to decline assigned overtime on days when she had worked her regularly scheduled eight-hour days. (Bell Dep. at 87-99; Bell Dep. Ex. 2.)

On May 26, 2005, CSXT's Director, Crew Availability A.E. Walczak sent Plaintiff Bell a letter that stated in part, "You are charged with using FMLA under false pretenses to avoid working when you stood for service and marked off using FMLA on the following dates when you were only approved for office visits . . . ." The letter summoned Bell to a formal

20

investigation hearing to be held June 15, 2005. (Doc. 117-2 at 151 (Bell Dep. Ex. 32)(listing seven dates in May 2005).)  According to CSXT, the letter "incorrectly stated that she had only been approved to use intermittent FMLA leave for doctor's visits" which was inconsistent with the April 13, 2005 FMLA intermittent leave approval, authorizing leave for doctor's visits and for working more than 16 hours.  (Doc. 109 at 11.)

On May 31, 2005, Bell submitted a corrected physician certification in which her physician wrote: "'5/27/05 After long discussion with patient she is not able to work but eight hours per day due to fatigue, swelling, exhaustion.'"  (Doc. S-1 (Bell Dep. Ex. 33).)  Bell testified that she had had a language and communication error with her "Asian foreign descent"  physician leading to the physician's error on the March 16 certification form (Bell Dep. at 174, 177.)  Bell explained the error and correction to the investigative hearing officer. (Id. at 181.)

On July 12, 2005, CSXT informed Bell that "[a]ll charges with regard to the . . . investigation have been cancelled and will be removed from your record."  (Doc. 117-2 at 153 (Bell Dep. Ex. 35).)  As a result, Bell was not denied FMLA leave for the May dates for which she declined the overtime work.  (Bell Dep. at 229.)

Bell has not shown that CSXT's actions in any way restrained her exercise of FMLA rights.  CSXT took no adverse employment action against Bell, and the undisputed evidence shows that Bell actually received her requested FMLA leave.  See Ragsdale, 535 U.S. at 89.[16]

_____

[16]   Curiously, Bell, in her motion for summary judgment, cites CSXT's certification of "leave for office visits only," (Doc. 108 at 1), presumably referring to Count III, and argues

**C.     Staphenia Simmons: Count II ("Re-Certification")**[17]

Plaintiff Staphenia Simmons alleges that CSXT interfered with her FMLA rights by asking her to recertify her FMLA leave four times in approximately three years (March and December 2005, and March and December 2006), although her annual August medical certifications each specified that the probable duration of her serious medical health condition was one year.  (Compl. ¶ 46; Doc. 106 at 8.)[18]  Simmons likened the repeated requests for certification to "harassment" which upset her.  (Doc. 106 at 8 (quoting Doc. 106-11 at 2-3 (Simmons' Dep. at 71-72).)

Simmons at all times relevant, was employed by CSXT.  She first requested CSXT approve intermittent leave for her in August 2001, in connection with absences between July

_____

CSXT "interference" with her FMLA rights in June, 2006, when, based upon a May 30, 2006 medical certification letter, (Doc. 108-2), it limited her FMLA eligbility to "two office visits per month and to work no more than 8 hours per day."  (Doc. 108-4.)  Bell disputed this authorization, contending that she should also be authorized to use intermittent FMLA leave for episodic medical incapacity due to her chronic medical condition.  (Doc. 108-5.) Bell's motion based on this argument is due to be denied for several reasons.  First, Bell cannot raise this new unpleaded claim in a motion for summary judgment without first obtaining leave to amend her complaint to reflect the 2006 claim, see Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004), which would raise questions of "extreme untimeliness" at this juncture of the litigation.  See Smith v. Sch. Bd. of Orange County, 487 F.3d 1361, 1367 (11th Cir. 2007), cert. denied, 128 S.Ct. 2513 (2008).  Second, the dispute between Bell and CSXT concerning the 2006 FMLA certification has apparently been resolved, and Bell has been permitted to take FMLA time for all episodes of medical incapacity, without any disciplinary consequence, to Bell's satisfaction. (Bell Dep. at 213-14.)  Again, Bell has failed to adduce any evidence that she has suffered damage or "actual monetary  losses" as a result of any conduct by CSXT.

[17]   The parties have filed cross motions for summary judgment as to Staphenia Simmons (Docs. 106, 112.)

[18]   Based upon her motion for summary judgment, Simmons has apparently abandoned her allegation that CSXT retaliated against her.  (See Complaint ¶ 46.)

25, 2001 and August 2, 2001. She submitted a medical certification dated August 9, 2001 from a health care provider which stated that Simmons' medical condition - "symptoms of major depression" - commenced on July 25,[19] had a "probable duration" of "3 months," and that it would not be necessary for Simmons to work intermittently. (Doc. S-4 (Simmons' Dep. Ex. 6).) The certification represented that Simmons required "doctors visits monthly" and a "therapist once a week" and that she was "acutely ill" and unable to work between July 25 and August 2, 2001. (Id.) CSXT approved FMLA leave based upon the certification. (Doc. 118-2 at 9 (Simmons Dep. at 31).)

This medical certification process was repeated in August 2002 and August 2003 by Simmons' health care provider, psychologist Deena Richman, Ph.D., who had begun treating Simmons in 2001. (Simmons Dep. at 33) Dr. Richman certified that Simmons suffered from a chronic condition requiring treatment, "[d]epression occurring episodically causing inability to concentrate," though Simmons was "not presently incapacitated," and that she required intermittent leave. In both forms, Richman indicated that the condition commenced on the date of the form and had a "probable duration" of one year, but did not indicate how long Simmons would require intermittent leave. (Doc. S-4 (Simmons Dep. Exs. 7, 8).) In both instances, CSXT authorized intermittent FMLA leave for Simmons. (Simmons Dep. at 42.)

Simmons submitted the next FMLA certification form completed by Dr. Richman in August 2004. (Doc. S-4 (Simmons Dep. Ex. 9).) Richman listed Simmons' condition as

---

[19] Simmons testified that the condition actually began "[p]robably in 1999." (Doc. 118-2 at 7 (Simmons Dep. at 27).)

"Chronic depression" which "commenced: 8-11-04" with a "probable duration of condition: 8-11-05."  Again, Richman certified that it would be necessary for Simmons to be approved for intermittent leave: "intermittently/ few days per month" but did not indicate on the form the probable duration of the leave requirement.  In response to the form entry asking if the patient was incapacitated and if so, the likely duration and frequency of incapacity, Richman responded that Simmons was "not presently incapacitated" by her condition.  Richman indicated that Simmons would require "individual counseling" two times a month and a "probable number of treatments: 10+." (Id.) On August 27, 2004, CSXT approved Simmons' requested FMLA leave based on this medical certification.  (Simmons Dep. at 47; see also Doc. 118-2 at 55 (Simmons Dep. Ex. 10).)

On March 11, 2005, CSXT informed Simmons she would have to obtain recertification,  saying that Simmons' current FMLA certification form from her health care provider did not support her use of 51 days of FMLA leave between March 10, 2004 and March 11, 2005.  (Id.)  CSXT provided a letter dated March 11, 2005 to Simmons that was addressed to her health care provider setting forth the dates Simmons had taken leave, and requesting Richman to certify that Simmons' use of 51-days of leave in the 12-month period was consistent with her serious health condition.  (Doc. 118-2 at 57 (Simmons Dep. Ex. 11).) CSXT FLMA Administrator Jolanda Johnson (later Dove) stated that she "asked Ms. Simmons to recertify her health condition because her absences appeared to be far in excess of the number anticipated based on Dr. Richman's August 2004 medical certification ('a few days per month')," and accordingly, told Ms. Simmons, "'[y]our current FMLA certification form from your health care provider does not support your use of FMLA leave.'"

24

(Doc. 113-2 at 12 (Dove. Supp. Decl. ¶ 17).)

On March 24, 2005, Dr. Richman certified that these absences were due to Simmons' serious health condition. (Doc. S-4 (Simmons Dep. Ex. 12).) Dr. Richman submitted a new certification which stated that Simmons had "chronic depression" that "commenced" "03/24/05" with a "probable duration" of "03/24/06." Dr. Richman indicated it would be necessary for Simmons to work intermittently with a "probable duration" of "episodically," and advised that Simmons was "not presently incapacitated." She indicated that Simmons would require 24 "Biweekly therapy." (Id.) Based upon Richman's recertification, CSXT continued to approve Simmons' FMLA intermittent leave. (Simmons Dep. at 53.) On August 11, 2005, Dr. Richman made the same certification and CSXT continued to approve FMLA leave for Simmons. (Doc. S-4 (Simmons Dep. Ex. 16); Simmons Dep. at 61.)

Between August 12 and December 18, 2005, Simmons was absent from work on 32 days for which she used FMLA leave. (Simmons Dep. at 65; Doc. 118-2 at 64 (Simmons Dep. Ex. 19).)

On December 20, 2005, CSXT FMLA Administrator Johnson required Simmons to obtain a recertification of her FMLA leave, noting that Simmons' "approved use of FMLA leave is for episodes and 24 office visits . . . ." Johnson stated that Simmons' "current FMLA certification form . . . does not support this use of FMLA leave. Therefore, we are requiring you to obtain a recertification from your health care provider." (Doc. 118-2 at 62, 64 (Simmons Dep. Exs. 18, 19).) Johnson states in her declaration that she "asked Ms. Simmons to recertify her health condition because the number of absences during this four-month period appeared excessive in view of the fact that Dr. Richman, in her current medical

certification . . . , had simply stated that Ms. Simmons would need to be absent 'episodically' but had provided no estimate of either the probable duration of the period Ms. Simmons would need intermittent leave or the likely duration and frequency of episodes of incapacity." (Doc. 113-2 at 13-14 (Dove. Supp. Decl. ¶ 21).)

In early January 2006, Simmons returned the certification form completed by Richman on January 2, 2006, in which Dr. Richman confirmed that Simmons' absences were due to her serious health condition (See Doc. 118-2 at 69 (Simmons Dep. Ex. 22).) On January 5, 2006, CSXT FMLA administrator Johnson stated in a letter to Simmons that Simmons' "FMLA leave was approved for episodes and 24 office visits." (Simmons Dep. Ex. 22.)

Simmons was absent from work using FMLA leave an additional 12 days during the three months between December 19, 2005 and March 16, 2006. (See Doc. 118-2 at 76 (Simmons Dep. Ex. 24).)

On March 21, 2006, CSXT sent Simmons another letter requesting recertification, stating that Simmons had used 44 days of FMLA leave between August 12, 2005 and March 17, 2006 (including those 32 absences cited in the December 20, 2005 request for re-certification), and addressed another letter to Simmons' health care provider asking if the 44 absences total (from August 2005 through March 2006) was consistent with Simmons' serious health condition. (Doc. 118-2 at 71, 73 (Simmons Dep. Exs. 23, 24).)

On March 27, 2006, Simmons' health care provider Richman certified that the 44 absences were consistent with Simmons' serious medical condition. (Doc. S-4 (Simmons Dep. Ex. 25).) In a handwritten note, Dr. Richman wrote:

> I was asked to recertify Ms. Simmons [sic] FMLA at the

> beginning of January and now in March. Her condition of
> depression is chronic and therefore her use of FMLA is
> appropriate. Why is it necessary for me to recertify her every 3
> months?

(Doc. S-4 (Simmons Dep. Ex. 26).) On March 29, 2006, CSXT recertified Simmons for

FMLA intermittent leave "for episodes and bi-weekly office visits." (Doc. 118-2 at 78

(Simmons Dep. Ex. 27).)

In August 2006, Simmons submitted the next medical certification form, which was

identical to the past certifications completed by Dr. Richman, except that she indicated that

Simmons' condition "commenced" "8-9-06" and that the "[p]robable duration of the condition"

was "8-9-07." (Doc. S-4 (Simmons Dep. Ex. 28).)

Between August 12 and December 20, 2006, Simmons was absent from work using

FMLA leave 22 days. On December 20, 2006, the CSXT FMLA administrator wrote to

Simmons that she was approved for FMLA leave "for episodes and 2 office visits per month,"

and that the use of 22 FMLA days in the four month period "does not support this use of

FMLA leave." CSXT required Simmons to obtain a recertification from her health care

provider. (Doc. 188-2 at 80 (Simmons Dep. Ex. 29).) FMLA administrator Johnson said she

"concluded that this number of absences in such a short period appeared to be inconsistent

with Dr. Richman's certification since Dr. Richman had simply stated that Ms. Simmons

would need to be absent 'episodically.'" (Doc. 113-2 at 16-17 (Dove. Supp. Decl. ¶ 28).)

CSXT director of labor relations at the time, Andrea Mateer, testified that "when we saw, it

looks like several episodes lasting more than one day at a time, we felt we needed to go

back to the healthcare professional to recertify these absences to make sure that, in her

opinion, this number of conditions for someone she said was not currently incapacitated was consistent with her condition." (Doc. 106-12 at 2 (Mateer Dep. at 116).) "[T]he doctor said she was not presently incapacitated, but then a month later, she started missing blocks of days. So at that point we went back and asked the doctor if those absences were consistent with her certification." (Id. at 4 (Mateer Dep. at 119-20).)

In response, Dr. Richman certified that the 22 absences questioned by CSXT were consistent with the serious health condition for which Simmons was previously certified. On this form, Dr. Richman indicated that she anticipated Simmons would be incapacitated by her condition once a month over the next 12 months, each episode lasting five days. (Doc. S-4 (Simmons Dep. Ex.30).)

Simmons was never denied any FMLA leave request in connection with any of CSXT's requests for recertification. (Simmons Dep. at 53-54, 95, 97, 98.) Simmons has not reapplied for FMLA leave since August 2007. (Simmons Dep. at 28.)

CSXT argues that it is entitled to summary judgment because (1) it "had the right to require Ms. Simmons to recertify her eligibility for FMLA intermittent leave" and (2) because "Ms. Simmons is not entitled to any relief for any FMLA violation that may have occurred in connection with her recertification." (Doc. 119 at 2.) As to the first contention, CSXT asserts that its "recertification requests were fully consistent with its rights under DOL regulations" (Doc. 112 at 14) because they complied with each of the conditions set forth in 29 C.F.R. § 825.308(a) (2006): "(a) Ms. Simmons suffered from a 'chronic,' 'long-term' condition; (b) CSXT's recertification requests always were more than 30 days apart [March 11, 2005, December 20, 2005, March 21, 2006 and December 20, 2006]; and (c) CSXT's recertification

28

requests always were in connection with Ms. Simmons' absences." (Id. at 15; see also Doc. 119 at 3.) CSXT argues that 29 C.F.R. § 825.308(b)(2)(2006), which prohibits an employer from requesting recertification in less than the minimum period specified as necessary for intermittent leave, is inpplicable because Simmons' health care provider certified her condition as "chronic" and none of the certifications provided CSXT with "her estimate of 'the probable duration' of the period during which Ms. Simmons would require intermittent leave." (Doc. 112 at 18.)[20]  And even if subsection (b)(2) does apply, CSXT argues that "[t]he extreme number of Ms. Simmons' absences . . . justified CSXT's conclusion that circumstances described by her previous certifications had changed significantly, thus authorizing recertification under § 825.308(c)(2)." (Id. at 21.)  "None of Ms. Simmons' certifications informed CSXT that it could expect Ms. Simmons to be absent on this frequent a basis." (Id.)

Simmons contends that inasmuch as Simmons' health care provider "set forth a duration in the FMLA certification form triggering the protections of 825.308(b)(2)," CSXT was prohibited from seeking recertification during the year of the certification. (Doc. 125 at

---

[20]  CSXT argues that 29 C.F.R. § 825.308(b)(1) (2006), which restricts an employer from seeking recertification until a specified "minimum duration of the period of incapacity" has passed does not apply "because in none of Dr. Richman's certifications did she ever indicate that Ms. Simmons would have any 'period of incapacity,' much less provide an estimate for the duration of any such period." (Doc. 119 at 4.)  Indeed, Dr. Richman repeatedly marked on the certification form that Simmons was "not presently incapacitated," and required only intermittent leave.

On its face, subsection (b)(2) which expressly relates to intermittent leave is implicated here, not subsection (b)(1) which discusses the "duration of the period of incapacity," which logically does not apply to intermittent leave.

29

3; see also Doc. 106 at 8 ("Dr. Richman listed a one year duration").) "If the duration of incapacity is known or the certifying physician set a period of intermittent or reduced schedule leave at more than thirty days, the employer must generally wait until that period has passed before requiring recertification." (Doc. 125 at 5.) Simmons argues that Dr. Richman "completed the FMLA form to correspond with the one-year certification period . . . [and] simply certifies that Ms. Simmons will need the leave for the entire one year certification." (Id. at 4.) Additionally, Simmons argues that Simmons' FMLA "markoffs" were not "extreme" and were well below the 12-week per year FMLA allotment, and suggests that CSXT should have requested clarification of Dr. Richman's certification or requested a second opinion rather than require recertificaiton. (Id. at 6, 7, 9.)[21] Simmons argues that CSXT interfered with her "right to use her FMLA leave by requiring recertifications without proper justification under the FMLA regulations." (Doc. 106 at 12.)

Simmons' health care provider certified that Simmons was suffering from a "chronic"

---

[21] Finally, Simmons contends that CSXT's doubting the validity of Simmons' particular health care provider, Dr. Richman, "does not meet the low statutory threshold standard of allowing recertification on a 'reasonable basis' and it is hardly justified by the statute." (Doc. 106 at 10 (citing 29 U.S.C. § 2613(e)).

On March 17, 2005, Richman had written CSXT a critical letter expressing her "concerns" about the "work environment" in the CSXT Crew Management Department as being "hostile and punitive" and "detrimental to employees' physical and mental health." "This past year I have had 15-20 clients who work in the Crew Management Department" who have presented with psychological symptoms that "appear to be directly related to their work environment." She acknowledged counseling her clients in seeking short or long-term disability benefits, and FMLA leave certifications. (Doc. 106-13 at 1-2.)

In its motion for summary judgment, CSXT does not question the validity of Dr. Richman's certifications, but rather contends that its requests for recertification could be justified by an apparent change in circumstances. See C.F.R. § 825.308(c)(2).

serious medical condition which required her to work intermittently, and never provided CSXT with a specific and defined limited period during which Simmons would require intermittent leave. Rather, Dr. Richman extended the one-year chronic condition year after year. None of Richman's certifications submitted on Simmons' behalf specified "the minimum period .. . necessary for such [intermittent] leave." 29 C.F.R. § 825.308(b)(2) (2006). This rendered § 825.308(b)(2) inapplicable and entitled CSXT to request recertification of Simmons' FMLA-qualifying chronic condition every 30 days "in connection with an absence by the employee." 29 C.F.R. § 825.308(a) (2006); see Stoops, 141 F.3d at 312; cf. Yntema v. U.S. Postal Service, No. 3:04 CV 7360, 2006 WL 515610, at *4 (N.D. Ohio March 1, 2006)("[s]ubsection (a) applies when a doctor does not specify a duration for a chronic illness, [or] long-term condition . . . ). While each of Dr. Richman's certifications listed the starting and ending date of Ms. Simmons' condition as being exactly one year apart, year after year, Dr. Richman responded that the "probable duration" of Simmons' need to work intermittently was: "one week off per month" (Doc. S-4 (Ex. 7 (August 27, 2002)); "intermittently" (Ex. 8 (July 30, 2003); "intermittently/few days per month" (Ex. 9 August 12, 2004)); "episodically" (Exs. 12, 16, 20, 25, 28 (March 24, 2005, August 11, 2005, January 2, 2006, March 27, 2006, August 9, 2006). It was clear from the certifications that Simmons' condition was "chronic" with no anticipated specific ending date for the need for intermittent leave. Cf. Parsley, 471 F. Supp.2d at 863 (subsection (b) "does not refer to the minimum duration of the health condition . . . [but] pertains to the 'period of incapacity.'") As in Parsley, supra, "this case fits squarely within the provisions of § 825.308(a) which concerns 'chronic or permanent/long term conditions.'" 471 F. Supp.2d at 863. Simmons' condition

31

satisfied all three elements of "chronic serious health condition," namely it required periodic treatment; it continued over an extended period of time with recurring episodes; and caused episodic rather than a continuing period of incapacity. 29 C.F.R. § 825.114(a)(2)(iii)(A)-(C) (2006). It is proper to consider Simmons' condition as "chronic" and CSXT's request for recertification as being subject to the provisions of 29 C.F.R. 825.308(a).

Additionally, CSXT's requests for recertification were prompted by extended multi-day absences while Dr. Richman's certifications specified Simmons would require intermittent leave "episodically" and for two therapy appointments per month. It was "reasonable" for CSXT to believe that circumstances, specifically the nature of the serious medical condition described by Dr. Richman's certifications, had changed. See 29 C.F.R. § 825.308(b)(2) and (c)(2); 29 U.S.C. § 2613(e). CSXT's communications evidenced its position that Simmons' FMLA absences were not consistent with her health care provider's certification. CSXT did not abuse the recertification requirement by asking Simmons to obtain medical recertification more than once in a one-year period. CSXT merely asked her psychologist (who she was seeing for therapy every two weeks) ) to fill out a recertification form; there is no evidence that CSXT's recertification requests interfered with Simmons' FMLA rights, or that she was prejudiced by the recertification request.

Finally, even if an FMLA violation had occurred in connection with CSXT's requests for recertification, Simmons is unable to establish, based on this record, that she is entitled to recover monetary damages or to equitable relief. Graham, 193 F.3d at 1284; 29 U.S.C. § 2617(a)(1)(A) and (B). Simmons has suffered no economic loss or injury; was never prevented from taking requested FMLA time; was never disciplined; and has adduced no

32

evidence that she lost money in connection with obtaining the recertifications from Dr. Richman. Damages for "mental distress" are not recoverable. <u>Graham</u>, 193 F.3d at 1284

Simmons testified that she has not submitted a request of certification for FMLA leave since August 2007. (Simmons Dep. at 28.) She has demonstrated no likelihood of violation or injury in the future which could raise the issue of equitable relief. In light of there being no evidence of a violation of the FMLA or of FMLA injury, CSXT is due to be granted judgment on Simmons' request for declaratory and injunctive relief.

### D.     <u>Leonard Platt: Count IV ("Second And Third Opinions")</u>[22]

Plaintiff Leonard Platt contends that CSXT violated the provisions of the FMLA by "unlawfully [requiring him] to obtain second opinions without a reason to doubt the validity of the medical certification, did not provisionally approve leave pending the second opinion process, had second or third opinions performed by regularly used healthcare providers, and placed the burden upon plaintiff to provide completed second opinion certification." (Doc. 122 at 1.)[23]

Platt has been employed by CSXT as a crew dispatcher in CSXT's Crew Management Center since 1998. (Doc. 116-2 at 4-5 (Platt Dep. at 7-8).) On August 29,

---

[22]   Only CSXT has filed a motion for summary judgment as to Leonard Platt. (Doc. 111.)

[23]     Platt has abandoned his claims that 1) CSXT failed to provide Platt with copies of the second and third opinions (Compl. ¶ 88; Docs. 111 at 21; 122 at 9); 2) CSXT interfered with his FMLA rights by requiring him to travel outside a reasonable commuting distance for a second opinion (Compl. ¶¶ 95, 103; Doc. 111 at 21-22; 122 at 9); 3) CSXT interfered with Platt's FMLA rights by not reimbursing him for the work missed when securing the second opinion (Compl. ¶¶ 96, 101, 104; Docs. 111 at 23; 122 at 9), and that CSXT improperly shortened the time for Platt to return his second and third opinions from 15 days to five days. (Compl. ¶¶ 100, 104; Docs. 111 at 24; 122 at 10.)

2002, Dr. Richman certified that Platt suffered from a chronic serious health condition she described as: "Depression and anxiety, irritability that interferes with work concentration," though he was "not presently incapacititated." Richman indicated that the condition commenced "08/24/02" and that the condition had a "[p]robable duration" of "1 year." She certified that it would be necessary for Platt to work intermittently through August 8, 2003, specifying ongoing medical treatments; certifying that the "probable number of treatments" required was "10" and that the "nature of the treatments" was "psychiatrist - medication management." (Doc. S-3 (Platt Dep. Ex. 8.) CSXT approved Platt for FMLA leave based on this certification. (Platt Dep. at 37.) Dr. Richman provided similar certifications on August 29, 2003 and March 1, 2005.

On April 7, 2005, CSXT's Johnson sent Platt a letter requiring Platt to obtain a second opinion, at CSXT's expense, from psychologist Alan Harris, Ph.D. Johnson advised that the appointment should be scheduled during "off duty time" and if it is scheduled during Platt's assigned work hours, "that absence will not be treated as FMLA." Additionally, Platt's FMLA was conditionally approved pending the second opinion (and third opinion if necessary) but any conditional FMLA leave would be changed to unexcused absences should Platt not follow through with the second (and third) opinion requirement. (Doc. 116-2 at 92 (Platt Dep. Ex. 14).)

On April 24, 2005, Platt communicated by e-mail with his supervisor that the first available appointment with the Dr. Harris was April 26 at 3:00 p.m., which was when he was scheduled to begin work that day. Platt requested "permission to mark off company business for that day, so I do not suffer any financial burden do [sic] to the second opinion

34

required by the medical department." (Doc. 116-2 at 94 (Platt Dep. Ex. 15).) The second opinion appointment lasted one to two hours. (Platt Dep. at 56.) Platt did not work that day and was not paid. (Id.) CSXT paid for the appointment. (Id.)

Dr. Harris evaluated Platt's psychological condition. (Doc. S-3 (Platt Dep. Ex. 16).) Dr. Harris did not certify Platt for FMLA leave, saying that Platt was not suffering from a "serious health condition" within the meaning of the FMLA. Dr. Harris also indicated that it would not be necessary for Platt to work intermittently or on less than a full schedule. (Id.) Platt testified that he never saw the report prepared by Dr. Harris and does not remember whether he asked CSXT for a copy of it. (Platt Dep. at 60-61.)

On May 25, 2005, CSXT FMLA administrator Johnson wrote to Platt that because the opinions of Platt's and CSXT's designated health care providers disagree, "in accordance with the Department of Labor's FMLA regulations, if you wish to proceed with your request for FMLA eligibility, you are required to obtain a third 'tie breaker' medical opinion at CSXT's expense." Johnson advised Platt to provide the names of three health care providers for a third opinion. Platt submitted a list of proposed third opinion providers and CSXT selected from the list psychologist Janice Miller, Ph.D. to conduct the examination. CSXT advised that Platt was "conditionally approved for FMLA leave as you go through the third opinion process." (Doc. 116-2 at 107 (Platt Dep. Ex. 24).) Platt testified that he understood that while the third opinion was pending, he was still conditionally approved for FMLA. (Platt Dep. at 88.)

Platt met with Dr. Miller on July 21, 2005 for a third opinion. Platt was able to work his normal shift that day, and he did not miss any work in order to attend the Miller

appointment. He did not have to pay for the appointment. (Platt Dep. at 93, 100.) Dr. Miller certified that Platt suffered from a chronic "serious health condition" which she described as "significant anxiety and depression, difficulty sustaining concentration for extended periods [of] time, health issues (weight gain and high BP), headaches forgetfulness." (Doc. S-3 (Platt Dep. Ex. 26).) She stated Platt's condition commenced in January 2004, had a probable duration until March 2006, and that though he was "not incapacitated," it was necessary for Platt to work intermittently: "he will need less than FT schedule - He will likely be able to work 8 hr. shifts but will not be able to work multiple overtime shifts." (Id.) Dr. Miller recommended monthly counseling for six months with a re-evaluation, and that Platt "may be unable to work extended overtime." (Id.) Platt did see Dr. Miller's certification on the day it was prepared. (Platt Dep. at 93.)

On August 8, 2005, CSXT approved Platt for intermittent FMLA leave "for ten (10) office visits, as well as to work overtime at your discretion." (Doc. 116-2 at 115 (Platt Dep. Ex. 29).)

Platt continued to take FMLA leave throughout the period during which he was obtaining the second and third medical opinions. (Platt Dep. at 103; Doc. 116-2 at 80-84 Platt Dep. Ex. 2).) Platt received no reimbursement from CSXT for local mileage or time to attend the second and third opinion appointments. (Platt Dep. at 100.)

Platt next submitted a medical certification dated May 31, 2006 by Dr. Richman for the same psychological condition and certifying the need for intermittent FMLA leave. (Doc. S-3 (Platt Dep. Ex. 30).) CSXT approved intermittent FMLA leave for Platt based upon Richman's 2006 certification. ((Platt Dep. at 108.) Platt has never been denied FMLA leave

he requested.  (Platt Dep. at 109.)

## 1.  Request For A Second Opinion

Platt first argues that CSXT did not have the right to require him to obtain a second certification opinion because there was no "reason to doubt the validity of the certification." "[H]ere the reason for casting doubt is largely unjustifiable and ultimately tries to conceal a personal dislike of Mr. Platt's health care provider. . . . The certification form submitted by Mr. Platt and completed by Dr. Richman met the specifications of the defendant's requirements for FMLA certification."  (Doc. 122 at 6.)  Platt charges that CSXT administrators "based their justification for seeking a second opinion on their personal feelings about Dr. Deena Richman." (Id.)  Platt cites to the testimony of Andrea Mateer, former CXST director of labor relations between January 2005 and May 2008 who said, "[S]he wasn't a doctor.  She was a counselor.  And we started getting a large number of med certs from [Richman].  I mean, an unusually large number of med certs from her for only from clerks in Jacksonville, and the condition always appeared to be the same . . . ." (Doc. 106-12 at 1 (Mateer Dep. at 33).)  Mateer said it was her information that Richman "hated CSX . . . [s]o that gave us reason to . . . suspect the validity of whether they really had a serious health condition or not."  (Id. at 34; see also supra at 30-31 n.21.)

Additionally, Platt contends it was improper for CSXT to compare the March 2005 certification in which Richman upgraded Platt's need for intermittent leave to include FMLA leave from assigned overtime at Platt's discretion with earlier submissions certifying FMLA leave for counseling appointments only.  (Doc. 122 at 7.)

CSXT FMLA administrator Jolanda Johnson declares that she had "reason to doubt

the validity of Dr. Richman's statements concerning the seriousness of Mr. Platt's health condition in March, 2005." (Doc. 113-2 at 8 (Dove Supp. Decl. ¶ 12).) "First and foremost, Mr. Platt was not the only CSXT Crew Management Center employee who was submitting FMLA certifications from Dr. Richman in order to avoid working mandatory overtime hours." (Id. (stating she had reviewed "many" such certifications involving the "same medical conditions" and requiring "the same work restrictions").) Johnson noted that prior Platt certifications had stated that his condition had a probable duration of one year, and indeed, Platt had gone six months between August 2004 and March 2005 without the need for FMLA leave. Additionally, Johnson recalled that prior certifications had requested intermittent leave only to attend monthly counseling sessions as compared with Richman's March 2005 request that Platt be permitted - at his discretion - to decline overtime work, considerably upping the recommended FMLA leave requirement. (Id.)

An employer may require a second opinion "[i]n any case in which the employer has reason to doubt the validity of the certification . . . ." 29 C.F.R. § 2613(c). The only limitation listed by § 2613(c) is that the second opinion health care provider "shall not be employed on a regular basis by the employer." 29 U.S.C. § 2613(c)(2); see also Bailey v. Southwest Gas Co., 275 F.3d 1181, 1186 (9th Cir. 2002); Chapen v. Munoz, No. 3:06-cv-00353-BES-VPC, 2009 WL 511114, at *4 (D. Nev. Feb. 25, 2009); Barnes v. LaPorte County, No. 3:07-CV-297 CAN, 2008 WL 5263364, at *3 (N.D. Ind. Dec. 16, 2008). The employer may require a third opinion, at the employer's expense, by a health care provider designated or approved jointly by the employer and the employee to resolve a conflict between the original certification and the second opinion. 29 U.S.C. § 2613(d). "Section [2613] concerns

38

certification of a serious health condition. The provision is designed as a check against employee abuse of leave under [2612]." S. Rep. No. 103-3, 25-26 (Jan. 27, 1993), reprinted in 1993 U.S.C.C.A.N. 3, 27-28. The regulations do not prohibit an employer from basing its "reason to doubt the validity" of a medical certification upon a significant upgrade in the amount of FMLA leave requested, or a perceived pattern emanating from a particular health care provider.[24] Even though it was ultimately proved that the certification was correct, the facts available to CSXT at the time it requested a second opinion provided "reason to doubt the validity of the certification."

Furthermore, Platt has not alleged nor has he adduced evidence that he suffered injury from this alleged breach. He was never denied FMLA leave in conjunction with CSXT's requirement he obtain a second opinion, and he has conceded that CSXT was not obliged to pay him for time missed securing the second opinion during working hours. (See Doc. 122 at 9.) "[T]he FMLA provides no remedy for the possible violation [of the second opinion provision] unless the action interfered with, restrained, or denied [the employee's] exercise of his rights under the FMLA." Darst v. Interstate Brands Corp., 512 F.3d 903, 911 (7th Cir. 2008). There is no dispute that Pratt received all of the FMLA leave to which he was entitled despite CSXT's request that Pratt obtain a second opinion from Dr. Harris.[25]

_____

[24] Platt's argument that Mateer's "personal opinion" about Dr. Richman is not a "reasonable basis" to require a second opinion is misplaced, as the "reasonable basis" standard applies to recertification, not to an employer requiring a second opinion. 29 U.S.C. § 2613(e).

[25] See supra n.10.

### 2. Denial Of Provisional FMLA Leave Pending Second and Third Opinions

Platt contends that he was denied provisional approval of FMLA leave "for a portion of the second and third opinion process," contrary to governing regulations. (Doc. 122 at 7 (citing 29 C.F.R. § 825.307(a)(2).) Platt cites to the "FMLA Denial" e-mail dated July 23, 2005 pertaining to the time period while Platt was securing a third opinion.[26] He offers no evidence and makes no argument regarding any denial of provisional leave during the period pending the second opinion. Argues Platt, "[t]he email ultimately denied him his right to take provision [sic] leave until that matter was cleared by his third opinion approval. The defendant has offered no evidence showing how or when this matter was resolved. As a result, there is an issue of material fact that precludes summary judgment." (Doc. 122 at 7-8.)

CSXT contends that this e-mail was "erroneous," and that the confusion may have stemmed from the expiration of Platt's FMLA leave to care for his seriously ill wife. (Doc. 111 at 18.) CSXT time records for July 22, 2005 indicate that Platt was paid for eight hours "straight time" that day. (Doc. 116-2 at 84 (Platt Ex. 2).)

Platt said he does not recall whether he asked for and was denied FMLA leave for July 22, 2005. "I'm just saying by what this [e-mail] says. . . . [H]onestly I don't recall back to 2005. . . . [A]ccording to this letter they denied my FMLA. But since they didn't put an

---

[26] On July 23, 2005, one of Platt's supervisors, Norma Brown, sent an e-mail to Platt entitled "FMLA Denial." (Platt Dep. Ex. 18.) In it, Brown said: "You marked off FMLA on 07/22/05. According to Peoplesoft [computer software program that electronically tracks FMLA leave] your FMLA request was denied 06/11/05." (Id.)

OTS [overtime shift] thing in there [time record] it wasn't for - to the best of my knowledge it wasn't for overtime and I might have accidently paid myself for that day, but I can't be sure. But either way they denied my FMLA." (Platt Dep. at 114.) Platt agreed that he suffered no discipline for "marking off" FMLA leave time that day. (Platt Dep. at 116.) "I went around and around with them and they finally got it fixed. . . . I had to go around and around with them. I've got to go around and around with them for pretty much everything as it comes to that. I think most of this was on the telephone with Andrea Maiden about my FMLA at that point and she finally got around to changing stuff and adding my FMLA and everything back in." (Platt Dep. at 116.)

Platt has not created a genuine issue of material fact. The cited e-mail, without more, is inadequate to create an issue of fact that CSXT actually denied Platt FMLA leave pending the third opinion. Platt was told and he understood that he was conditionally approved for FMLA leave, (Platt Dep. Ex. 24; Platt Dep. at 88), and he indeed continued to take FMLA leave pending the second and third opinions. (Id. at 103.) He does not recall the circumstances of the alleged denial and has failed to adduce any evidence that he was actually denied FMLA leave. Platt only "thinks" that the e-mail establishes that he was denied leave. A nonmoving party must produce evidence such that a reasonable factfinder could return a verdict in its favor. See generally Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). Platt has not done so here.

### 3. Second Opinion From Health Care Provider "Employed On A Regular Basis By The Employer"

Platt contends that his employer required him to obtain a second opinion from a

"Regularly Used Healthcare Provider," contrary to 29 U.S.C. § 2613(c)(2)(healthcare provider "shall not be employed on a regular basis by the employer').  (Doc. 122 at 8.)

Platt testified that "to my knowledge," CSXT had sent other employees to Dr. Harris for a second opinion, listing five names he thought were included.  (Platt Dep. at 78-81, 84.)  Platt also questioned Harris' demeanor; "[i]t's like he . . . didn't want us to be there."  (Id. at 81.)  Platt said that Harris "told us" "he was given a list [of questions] by the company . . . that they had a list of questions that they wanted asked . . . ."  (Id.)

FMLA administrator Johnson states that "Dr. Harris was not an employee of CSXT in 2005 and never has been employed by CSXT on a regular basis.  CSXT has requested that Dr. Harris provide the second opinion for more than one CSXT employee during 2005, but does not regularly contract for or otherwise regularly utilize Dr. Harris' services."  (Doc. 113-2 at 10 (Dove Supp. Decl. ¶ 14).)

Platt did not present any credible or admissible evidence proving that Dr. Harris was "employed on a regular basis" by CSXT.  "A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. [Citation omitted.]  The evidence presented cannot consist of conclusory allegations or legal conclusions."  Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

### 4.    Completion of Second Opinion Certification

Finally, Platt argues that he was required to ensure that the paperwork regarding the second opinion by Dr. Harris was properly delivered first to Harris and then back to CSXT,

and that "the burden of the second opinion was wrongfully placed on Mr. Platt," contrary to the statutory requirement that the employer secure the second opinion. (Doc. 122 at 8-9 (citing 29 U.S.C. § 2613(c)(1).) First, there is no dispute that CSXT paid for Platt's appointment with Dr. Harris. (Platt Dep. Ex. 14; Platt Dep. at 57.) That Platt had to actually call Dr. Harris and make the appointment with him at Platt's convenience is not violative of § 2613(c)(1). Platt also can establish no economic damages that resulted from Platt having to call to schedule the appointment. Finally, Platt's argument that he was required "to provide the results of the healthcare professional" to CSXT is belied by Platt's testimony that he never asked for or saw a copy of Dr. Harris' certification opinion. (Platt Dep. at 60-61.) Judgment is due to be granted to CSXT on this claim.

### E. Harvey Bolton: Count V ("Miscalculation Of The Eligible Hours Based Upon Normal Or Average Workweek")[27]

Plaintiff Harvey Bolton alleges that defendant CSXT violated and interfered with his "right to FMLA leave by miscalculating the hours of intermittent leave to which he was entitled," in violation of 29 C.F.R. § 825.205, and as a result of this miscalculation "he is entitled to relief." (Doc. 123 at 1; see also Compl. ¶ 105.)[28] Bolton alleges that his "schedule varies from week to week" because he "worked a number of overtime shifts a week, thus making his average number of hours to base the total of his FMLA leave to be greater than a person who worked only forty hours a week." (Compl. ¶¶ 111, 112, 113.) According to

---

[27] The parties have filed cross motions for summary judgment as to Harvey Bolton. (Docs. 107, 110.)

[28] Bolton, having cited no evidence of retaliation or offered any argument in support thereof, has apparently abandoned his retaliation claim. (See Compl. § 105.)

Bolton, CSXT is required to calculate his FMLA entitlement based upon "the hours that are actually worked or an average of hours worked in the twelve weeks preceding the commencing [sic] for FMLA certified intermittent medical leave." (Id. ¶ 114.)

CSXT argues that it is entitled to judgment because the undisputed facts establish "(1) CSXT correctly calculated the number of hours of intermittent FMLA leave to which Mr. Bolton was entitled based on his standard 40-hour per work week schedule, and (2) Mr. Bolton is not entitled to any relief under the FMLA for any miscalculation of his intermittent leave entitlement that may have occurred because he was never denied any intermittent FMLA leave benefits as a result of any such miscalculation." (Doc. 110 at 2.)[29]

CSXT FLMA administrator Jolanda Johnson (Dove) states that CSXT calculates intermittent leave as follows: "CSXT initially calculates an employee's intermittent FMLA leave entitlement to be equivalent to 480 hours [40 hours/week × 12 weeks FMLA leave] during a rolling backward 12-month period when the employee's normal and usual work schedule in a workweek is 40 hours or less." (Doc. 83-2 at 15-16 (Dove Decl. ¶ 38).) If an employee contends he or she is entitled to more than 480 hours of intermittent leave in a 12-month period, CSXT "will review the employee's time records to determine whether the employee's work schedule during the 12 weeks prior to the beginning of the leave period varied and, if so, whether the weekly average of hours worked during that period exceeded

---

[29]     Because the FMLA does not specifically address the appropriate method for calculating "12 workweeks of leave," 29 U.S.C. § 2612(a)(1), the Court turns to the language of the corresponding implementing regulations. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Intermittent leave is calculated in accordance with 29 C.F.R. § 825.205 (2006).

40 and will credit the employee with additional FMLA intermittent leave hours if appropriate." (Doc. 113-2 at 2 (Dove Supp. Decl. ¶ 4).)

At the times relevant (after June 2004), Bolton worked as a crew dispatcher.  Bolton's job was scheduled for five days per week, eight hours per day (40 hours a week) with two rest days.  The actual "rest days" could change from week to week.  (Doc. 115-2 at 6 (Bolton Dep. at 17).)

Bolton was first approved for FMLA intermittent leave for his serious health condition in 2004.  (Doc. 107 at 2 (citing Doc. 107-2).)[30]  He next received a medical certification for intermittent leave on September 22, 2005, and was approved for leave on October 6, 2005.  (Doc. 107 at 2 (citing Doc. 107-3).)  CSXT has approved Bolton for intermittent FMLA leave at various times since December 2004.

### 1.    Calculation Of FMLA Leave Entitlement

Bolton contends that 29 C.F.R. 825.205(d) (2006) controls because his "schedule in 2005 varied from week to week, stemming from his regular acceptance of overtime shifts[,] . . . his intermittent leave hours should be greater than a person who worked a basic forty-hour week"; "[c]learly, working overtime varies an employee's schedule."  (Doc. 123 at 3, 5, 6; see also Doc. 107 at 5.)  Thus, according to Bolton, CSXT "should have calculated Mr. Bolton's available intermittent leave hours based on the 'hours worked,' not his hours scheduled . . . ."  (Doc. 123 at 7.)  He cites to 32 hours of overtime worked between July 17,

_____

[30]    In his motion for summary judgment, Bolton states that he was first approved for FMLA intermittent leave on December 2, 2004.  (Doc. 107 at 2.)  He cites to a medical certification that bears the dates January 22 and 28, 2004.  (Doc. 107-2.)

2006 and October 6, 2006.  (Docs. 107 at 3; 123 at 3-4.)[31]  "In calculating the amount of FMLA leave available to an employee whose schedule varies from week to week, a weekly average of the hours worked over the 12 weeks prior to the beginning of the leave period should be used."   DOL Opinion Letter FMLA2002-1 (May 9, 2002)(available at http://www.dol.gov/WHD/opinion/FMLAna.htm ; Doc. 123 at 5.)  Bolton contends that "those thirty-two hours of overtime should have been added to Mr. Bolton's FMLA leave entitlement and he should have received 512 hours of leave instead of the 480 that the defendant allocated as a matter of course."  (Doc. 107 at 5.)[32]

CSXT argues Bolton was scheduled to work 40 hours per week, and that 29 C.F.R. § 825.205(a), which provides "that the number of hours of intermittent FMLA leave that an eligible employee may take in any 12-month period is determined by the number of hours in the employee's normal work week, multiplied by 12,"  is applicable here.  (Doc. 120 at 2.) CSXT contends that 29 C.F.R. § 825.205(d), which describes FMLA intermittent leave calculation based upon a "weekly average of the hours" "applies only when 'an employee's *schedule* varies,' not when the number of hours an employee works in a week happens to

---

[31]   Bolton's motion and argument suffers from a disconnect.  While he contends that CSXT should have considered his 32 hours of overtime worked between July and October 2006, he cites only to the October 6, 2005 leave approval.  (See Docs. 107 at 2, 3, 5; 123 at 3, 4, 5; see also Doc. 120 at 3, 4.)  The undisputed evidence establishes that CSXT approved Bolton's intermittent leave between 2004 and 2008.  Construing the facts in favor of Bolton, the Court assumes that Bolton's leave was also approved in October 2006.

[32]   Bolton merely added the 32 total number of overtime hours worked in the 12-week period to his alleged FMLA entitlement, rather than calculating the "weekly average of the hours worked over the 12 weeks" as required by 29 U.S.C. § 825.205(d) (2006). Additionally, by CSXT's calculations, Bolton worked a total of 41 hours of "unscheduled overtime" between July 17 and October 6, 2006.  (Doc. 120 at 4.)

vary," as is the case with Bolton's schedule. (Doc. 110 at 11 (emphasis in original).) Under CSXT's formulation, "if an employee has a fixed work schedule, the fact that from time to time he may miss some scheduled hours because of absences or may work some time in addition to his scheduled hours (overtime) does not affect the amount of intermittent FMLA leave he may take, which is based on his 'normal workweek.'" (Doc. 110 at 11 (citing § 825.205(d).) Otherwise, calculating FLMA intermittent leave would present "an administrative nightmare" of having to determine how many actual hours an employee worked as opposed to the employee's "normal work schedule." (Id.)

CSXT cites to a July 19, 1999 Department of Labor Opinion Letter interpreting the regulations governing calculation of intermittent leave:

> Under the FMLA, the term "workweek" is the employee's usual or normal schedule (hours/days per week) prior to the start of FMLA leave, and is the controlling factor for determining how much leave an employee is entitled to use when taking FMLA leave intermittently . . . . If overtime hours are on an "as needed basis" and are not part of the employee's *usual or normal workweek*, or is voluntary, such hours would neither be counted to calculate the amount of the employee's FMLA leave entitlement nor charged to the employee's FMLA leave entitlement. Where overtime hours are not part of the employee's *usual or normal workweek*, disciplinary action may not be taken against an employee for being unable to work overtime as a result of limitations contained in a medical certification obtained for FMLA purposes . . . .
>
> . . .
>
> . . . If overtime hours are part of an "eligible" employee's *usual and normal workweek* and the employee is unable to work overtime hours because of an FMLA qualifying reason, then any overtime hours not worked may be counted against the employee's FMLA leave entitlement so long as the employer designates the absence as FMLA leave.

DOL Opinion Letter FMLA-107 (July 19, 1999)(available at http://www.dol.gov/esa/WHD/opinion/FMLA/prior2002/FMLA-107.pdf; see also Doc. 110 at 12) see generally 29 CFR Part 825 The Family Medical Leave Act of 1993; Proposed Rule, 73 Fed. Reg. 7893 (Feb. 11, 2008)("current paragraph (d) explains how to calculate leave when an employee's schedule varies from week to week"). "[T]he focus is always on the workweek, and the employee's 'normal' workweek (hours/days per week) prior to the start of FMLA leave is the controlling factor for determining how much leave an employee is entitled to use." DOL Opinion Letter FMLA2002-1 (May 9, 2002). CSXT provides payroll records for 2005-2008 to illustrate that whether and how often Bolton works overtime are highly variable (with many months of from zero to one hour), and that overtime is not a part of his "normal workweek."[33]

Bolton's argument assumes that regulation § 825.205(d) applies because his "schedule varies from week to week" and that overtime hours logged in a 12-week period inflate his "weekly average of hours worked" above 40-hours a week. But overtime was not considered a part of the CSXT crew dispatchers' "usual and normal workweek" under the regulations in effect prior to January 2009. (See supra at 8-14 (discussion about "marking" Charisse Bell's overtime as FMLA leave; declining overtime for medical reasons not to be marked against employee's FMLA intermittent leave entitlement). Indeed, Bolton himself acknowledges that his overtime was due to "his regular acceptance of overtime shifts" (Doc.

---

[33] (Doc. 115-2 at 32, 47, 64, 79 (Bolton Dep. Exs. 3, 4, 5, 6); Doc. 113-2 at 2-7 (Dove Supp. Decl. ¶¶ 6, 7, 8, 9); Doc. 123 at 3-4.)

123 at 5) and that his schedule within any given seven day period was five days on and two days off. (Bolton Dep. at 17.)  It follows then that Bolton's overtime hours were not a part of his "usual or normal workweek," and should not be counted to calculate the amount of his FMLA intermittent leave entitlement.  This fact is borne out by Bolton's erratic logging of overtime hours through the years, sometimes going months without clocking any overtime. (See Bolton Dep. Exs. 3-6.)  The overtime hours available for Bolton's "acceptance" do not make Bolton's "schedule" variable, such that 29 C.F.R. § 825.205(d) applies.  Compare Brotherhood of Locomotive Engineers v. Union Pacific Ry. Co., 612 F. Supp.2d 954, 955-57 (N.D. Ill. 2007)(calculation of engineers' entitlement to 12-weeks FMLA intermittent leave determined pursuant to 29 C.F.R. § 825.205(d) where it was undisputed that engineers' assigned work schedules varied from week to week depending on trains scheduled to meet customers' demands and placement on assignment "board").  Bolton's overtime hours cannot be counted in determining Bolton's "usual or normal workweek" for purposes of calculating FMLA intermittent leave entitlement.[34]

_____

[34]  CSXT argues extensively that its payroll and time records reflect that Bolton's average time at work between 2005 and the first third of 2008 was less than his scheduled 40 hours of work per workweek. (Docs. 133-2 at 3-7 (Dove Supp. Decl. ¶¶ 6, 7, 8, 9); 110 at 5-9; 115-2 at 31 (Bolton Dep. Exs. 3- 6).)  Inasmuch as CSXT acknowledges that Bolton was entitled to a total of 480 hours of intermittent FMLA leave in a 12-month period, its averaging the hours worked by week over a 12-month period, yielding average weekly hours below 40 hours a week, was irrelevant and unnecessary.  (See Doc. 110 at 13.)  Furthermore, most of the "absences" logged (holidays, FMLA, personal leave and sick leave) represented leave time that Bolton was entitled to take.  What is relevant is that Bolton's record of overtime worked through the years confirms that it was not a part of his "normal workweek." Additionally, the record underscores that the total amount of intermittent leave take by Bolton in a 12-month period during these years was well below the 480 hours allotment.

## 2. No Prejudice Or Cognizable Injury

Even if CSXT miscalculated Bolton's intermittent FMLA leave entitlement, the undisputed evidence is that he never exhausted his 480 hour leave entitlement; never was denied requested FMLA leave; never was disciplined for requesting or taking FMLA leave; and never suffered any economic loss for any alleged miscalculation of his benefits. Indeed, Bolton admits to the following statement:

> 12. At no time during his CSXT employment has Mr. Bolton ever taken all of the 480 hours of intermittent FMLA leave to which he was entitled; he has never exhausted his FMLA leave entitlement. [Citing (Doc. 115-2 at 29 (Bolton Dep. at 98).)] He took only 296 hours of FMLA leave during 2005, only 160 hours of FMLA leave during 2006, only 152 hours of FMLA leave during 2007, and only 48 hours of FMLA leave during the first 3.5 months of 2008. [Citing (Doc. 113-2 at 6-7 (Dove Supp. Decl. ¶ 10); Bolton Dep. Exs. 3, 4, 5, 6.)] At no time has he ever been disciplined by CSXT because he was absent on FMLA leave for any days in excess of his FMLA leave entitlement. [Citing (Bolton Dep. at 98.)] At no time has Mr. Bolton ever lost money as a result of any alleged miscalculation by CSXT of the number of hours of intermittent FMLA leave he has been entitled to use. [Citing (Bolton Dep. at 107).]

(Docs. 110 at 9; 123 at 4.)

Thus, there is no evidence that Bolton suffered any cognizable injury under the FMLA or that CSXT in any way interfered with his FMLA rights. 29 U.S.C. §§ 2617(a)(1)(A) and (B); see also Ragsdale, 535 U.S. at 82 ("§ 2617 provides no relief unless the employee has been prejudiced by the [employer's] violation"). Bolton's contention that he "suffered a reduced intermittent leave entitlement" (Doc. 123 at 11) with nothing more fails to make out an FMLA interference claim.

Moreover, Bolton is not entitled to any equitable relief. He has adduced no evidence

of a violation of the FMLA and has demonstrated no likelihood of a FMLA violation or injury in the future.  See Rodgers v. City of Des Moines, 435 F.3d 904, 909 (8th Cir. 2006).

For the foregoing reasons, it is hereby

**ORDERED:**

1.      Plaintiffs Charisse Bell, Stephenia Simmons, Leonard Platt, and Harvey Bolton's claims against defendants CSX Intermodal, Inc. and CSX Corporation (Doc. 81) are **DISMISSED** for lack of subject matter jurisdiction.

2.      Plaintiff Charisse Bell's Motion For Summary Judgment (Doc. 108) is **DENIED**; Defendants' Motion For Summary Judgment On The Claims Of Plaintiff Charisse Bell In The Second Amended Complaint "B" (Doc. 109) is **GRANTED**.

3.      Plaintiff Staphenia Simmons' Motion For Summary Judgment (Doc. 106) is **DENIED**; Defendants' Motion For Summary Judgment On The Claims Of Plaintiff Staphenia Simmons In The Second Amended Complaint "B" (Doc. 112) is **GRANTED**.

4.      Defendants' Motion For Summary Judgment On The Claims Of Plaintiff Leonard Platt In The Second Amended Complaint "B" (Doc. 111) is **GRANTED**.

5.      Plaintiff Harvey Bolton's Motion For Summary Judgment (Doc. 107) is **DENIED**; Defendants' Motion For Summary Judgment On The Claims Of Plaintiff Harvey Bolton In The Second Amended Complaint "B" (Doc. 110) is **GRANTED**.

6.      The Court will enter Judgment in accordance with these rulings at the conclusion of the case.

7.      In light of the Court's rulings and before the Court turns its attention to the

remaining motions for summary judgment as to Complaint "A", the parties should take a hard look at those claims to see if they can be resolved. No later than **January 22, 2010**, the parties should advise the Court concerning the status of the remaining claims. A ruling on the pending motion for sanctions (Doc. 186) will be deferred.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of December, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record